with 23-1214 Drawbridge v. Schenectady County Department at Law. Good morning. May it please the court. My name is Mario Cometti. I'm here on behalf of the appellant, Mr. Drawbridge. I'm just going to cut to the chase on two issues. Speak right up. I'm sorry. I'm just going to cut to the chase. There's a button on the right and you can raise the podium on the side. Michael. I have court office. That's all right. Oh, wow. Magic. Rarely am I told not to speak up. So I'm going to cut to the chase. The two issues are whether my client has a claim under Monell and under his violation of substantive due process. With regard to the Monell claim, the argument is whether or not the pleadings in and of themselves establish a customer policy sufficient enough to warrant exposure to the defendant. I would under the I'm not going to repeat the factors. I'm sure the court is well aware of it. But basically, I believe that under Monell, we established both the widespread test and also the lack of training. With regard to the widespread test, I would point out that in the pleadings, every single employee that was questioned with regard to the customer practice confirmed and validated that this was a systemic problem throughout the social services, meaning every single one of them established that there was no policy, let alone training, with regard to maintaining records in the progress notes. Progress notes are the the the where the county obviously keeps information regarding the claim. If there is no policy, let alone training, there's no oversight with regard to how to maintain records. How could that not lead to potential constitutional violations? Not only that, there was no there was no training or policy with regard to forensic evaluations or interviews. Again, how could that not possibly lead to a violation of a constitutional right? Now, it's an important fact factor or fact in this case is in 2017, before the violation in this case was filed, there was a forensic interview taken and DSS did not put it in their records. Why is that important? My client, as in the prior proceeding, agreed to an ACOD. If he had known that a forensic interview had taken place prior to him taking that plea, he may not have taken that plea. He may have pressed the Department of Social Services to put their proof. They completely failed to put in their records any information regarding this interview of the child. OK, so counsel, the Monell says we have to show that the failure to train had a direct causation relationship to the harm suffered. So can you talk to us a little bit about how what is the constitutional harm you allege? I know that writ large, it's the denial of the right to parent effectively. But what is the specific harm and how did the failure to train cause that harm? Well, I'm not sure how I could be more specific in the harm than the denial of my client to have access to his child. And that was for a period between the initial complaint, he was allowed to have supervised access only? Was that the? No. No access at all? No access at all. OK. Well, supervised. I thought there was. There was a, he was allowed access in the, and I use the word supervised with a Wales Brown who was some court appointed. But he was denied his regular and extensive visitation rights. With regard to how the failure to train arose, they did a, well, I can list several specific things. For example, I'm going to give you one with regard to, sorry to point, I didn't mean to do that. No, no, I just wanted to make sure what we're getting at is how his loss of, it was some period of, I can't remember exactly how long it was between that he lost the, his visitation rights were sharply restricted, I guess. Well, first of all, they made a decision to file a petition without any investigation. Is the filing of the petition itself a harm? I believe. Constitutionally cognizable harm? I believe without any due process whatsoever, yes. I mean, literally in this, you know, Your Honor, these aren't just. How does that go to a Monell claim in the sense that it has to be more than just the egregiousness? Might be as to his own constitutional claim, but on the Monell claim, doesn't it have to be systemic that this happens all the time? It has to be. Pattern of practice? I think how we establish a pattern of practice is the issue before the court, and what I'm suggesting to the court is that the complete absence of a policy, let alone training. But in your brief, you say at 19 that it treated the father differently than any other respondent in DSS investigations. Well, and I, that would go, in my opinion, to the substantive due process and the egregiousness of their acts, angle, or aspect, which could in and of itself substantiate a claim he may have against the county. With regard to the Monell. It's indicated upon a generalized policy of practice that there are baseless family court petitions filed, done without investigations, etc., that parallel kind of like what happened to your client, correct? I'm not trying to do a generalized argument like saying that police officers know that they're not supposed to lie on their reports. So the lack of training is particularized as to your client, but you don't- No, I- That it results in similar situations for other people in similar situations. I would argue it isn't just to my client. There are no policies. There's no policies as to keeping records. There's no policies as to maintaining records. There's no policy to oversee the records. There's no policy with regard to forensic interviews. I can't imagine a more dangerous- And yet you don't have alleged examples of widespread or even sporadic violations. How could- if the county is not keeping records, how should- they're using it as a sword and a shield. It's not fair for them to say, we aren't going to keep records in any particular way, but we're going to hold you responsible for instances where there's been violations or constitutional deprivations. I think this is one of those rare cases where the complete absence of a policy, the complete absence of a training, I'm not talking about- there is no policy whatsoever on these issues. And I want to point out to the court that our pleadings was very specific. We weren't making just bold-faced claims, throwing them against the wall. Excuse me. Just to note, you're out of time, Mr. Kometi. You've reserved three minutes for rebuttal. You're welcome to use that now or save it for- I'll save it, Your Honor. Thank you. All right, we'll hear from Mr. O'Connell. William O'Connell for the Defendant Appellees, Schenectady County, DSS, and Schenectady County. Good morning, Your Honors. I'm going to go right to the Monell claim. Obviously, you need a customer policy here to hold a municipality liable. Plaintiff has only really alluded to two of them. He doesn't mention any policymaker in his complaint or an action by a specific policymaker. So we really can exclude the other ones. But he points to a consistent and widespread practice that constitutes a customer usage of which policymakers must have been aware. Again, some of Your Honors have asked questions. There's no other cases. He's referring to essentially facts that happened within two weeks and then maybe a month or two after when he was denied certain limitation rights. But we're not talking about any other cases, any other parties, any other instances where neglect petitions were filed based on false or fraudulent information. And that's really what he's saying. But the heart of him is really going to the failure to train claim. And that really hinges on deliberate indifference. Failure to train, claim, or supervise is actionable as a municipal policy only if the more or better training is so obvious and the inadequate training is so likely to result in constitutional deprivations that policymakers can reasonably said to have been deliberately indifferent. And the Second Circuit has a test for that. And there are three requirements. The policymaker must know to a moral certainty the employee will face a particular situation. There's no allegation about that in his complaint. The situation must present the employee with a- Can we just assume that when the person's job is to investigate allegations against a parent about treatment of a child, that they can know they're going to face the situation about whether bringing a complaint against that parent is going to result in the child being taken away. That's sort of what these folks do, right? They investigate to determine whether to file petitions that result in the separation, termination, suspension, limitation of parental rights. Correct. I guess I'm focusing on the word particular situation there. And maybe that, if you look at it more narrowly, is there any allegation or proof that a policymaker knew that they were going to face a situation with this type of competing allegation of coaching, which is what occurred in this case. In my estimation, that wasn't met. But even if you broadly say it did, the situation must present a difficult choice or there is a history of the situation being mishandled. There's no history here. There's no allegation about other cases. Counsel points to, basically, he cherry picks a few instances where she did not make a notation about a certain thing, admittedly an important thing, but there's no allegation of a broad or He didn't establish it. He didn't allege it, except for these one or two instances which he cites in his complaint. A difficult choice, obviously, could be two different ways you can show that. A plaintiff can show it by handling the situation requires more than common sense, or the employee has a powerful incentive to make the wrong choice. They didn't have a powerful incentive to make a wrong choice. I don't think any of us would really think that. But whether it requires more than common sense, I think plaintiff might disagree. But in this instance, if you look at the confidential record and Ms. Pilsak's testimony, who was the child protective worker, she was very, very clear. Her goal is to protect that child. And whether it takes competing allegations from either side, it really was a matter of finding out who was telling the truth and making the best decision that she could based on that information. That doesn't really require more than common sense. It requires good, thoughtful consideration of the issues on both sides. To be clear- Yes. The county's position that employees tasked with investigating child abuse or neglect petitions of various kinds are not required to have any other tools at their disposal than common sense. That that's sufficient to figure out, to understand things like what age of child is more likely to testify truthfully. Does this parent have a history of allegations of coaching? I mean, I'm surprised. I was very surprised at that argument. That people tasked with this job, the county firmly believes. You come to apply and you say, hi, I'm here to apply for this job. I have common sense. That should be sufficient. No, Your Honor. And plaintiff obviously referred to this in his brief. And he did not agree with that, my argument on that. But it's my belief that common sense in this case really is what the caseworker in the end is going to have to rely on. I'm not saying that she- and counsel said there's no training at all. That's not true. The caseworker testified that there was training and there was forensic interview training. So they do get trained in these instances. But as far as requiring something more than common sense, I sort of see it more as a technical or some sort of expertise. But I don't think it really does require more than common sense. That person is sitting there having to decide, is this person telling us the truth or are they not? And what do we do about that if we find that there's an allegation of abuse or neglect that can't be disproven? We have to protect the child. And either way, that whole argument about the test for the Second Circuit was never pled in his complaint. He doesn't plead facts or the test itself. So he's kind of lumping onto it now, but he didn't plead it in his complaint. And he's the one who said, as we know and respectfully, that we have to judge it based on the allegations in the pleading. My real point here, though, is a pattern is required. All the cases that I looked at at the Second Circuit, all of them do require, in order to show deliberate indifference under a failure to train or supervise theory, there has to be an awareness by the policy makers or such number of incidents that were publicized or out there that they should know about. Otherwise, you can't say it's a conscious choice or deliberate indifference. There has to be other, and plaintiff does have that obligation. It may be difficult, but it's there and the courts respect it. So with that, Your Honor, I don't think there was a substantive due process violation in this case, but that would be an alternative argument to refer. All right. Thank you, Your Honor. Mr. Clemente, you have three minutes. Let me just end on the, well, start with the substantive due process. He didn't address it at all. And I'm shocked that at the lower court level, the judge says it's a very, I'm quoting on page 20, record 385, it is a very close call as to whether these allegations alone demonstrate that the actions of the defendants' county DSS employees were so egregious. The fact that the judge recognized it as being a close call in and of itself means that it should, we pled an egregious actions. And for them to suggest that we weren't specific in our facts, Your Honors, my complaint is replete with testimony, specific excerpts from deposition transcripts. How more specific can you be than to use their own words under oath against them? And I was shocked for him to say that there was no incentive to make a bad choice with regard to the lack of training. The bad choice is there was an incentive for them to use the forensic interview to bootstrap an investigation that should not have, a petition that should not have even been filed. From day one, before they did a single bit of investigation, before they got a single piece of evidence, they made a decision to file a petition. And then they're, he's trying to argue to the court that there's not an incentive to play with the results of the forensic interview. Is it any coincidence that the forensic interview was not made contemporaneous? There's no contemporaneous notations. And he is incorrect when he states that we, there was no training with regard to any of the forensic interviews. And in this case, this poor child was subjected to four. So, I mean, I don't know what, if this isn't egregious for a DSS to file a petition without doing any investigation. Think of the implications. The hotline report did not pertain to my client. It pertained to another person. The forensic interview, to the extent it took place, corroborated the hotline report, except as against my client. But one incident doesn't make a pattern, correct? I understand, but when you have, are we going to condone a DSS? I'll end on this stuff. Wait, wait. There's a difference between him having a specific claim with regard to the acts of an individual and those acts being then attributable to the county under Monell theory. I understand. And that's why I asked you that question. So the question is, is this general, a general practice, or is this specific as an egregious act with regard to your client? I contend it is a general when you don't have any policies, let alone training, let alone supervision. How is that not general? Right? I mean, and that answers, I think that addresses the issue of, may I have 30 seconds? You may. I think that addresses the issue. They keep harping on how the policymaker didn't know. Well, you don't, you're a policymaker and you're not aware of the fact that the complete absence of a policy, training, and supervision, I mean, if that's not constructive notice, then what is? Thank you. All right, thank you to both sides. The matter is submitted. We'll take it under advisement and turn to our next.